UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

LISA M. BRADY,                                                        Case No. 1:20-cv-00910

          Plaintiff,                                                         Barrett, J.
                                                                    Bowman, M.J.

      v.

DAVITA, INCORPORATED,

          Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff Lisa M. Brady filed this action against her former employer, alleging claims of unlawful employment discrimination and/or retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §1981, and related claims under Ohio law.  The Court previously granted Defendant's motion to dismiss Plaintiff's Title VII claims as untimely, while allowing Plaintiff's claims under 42 U.S.C. § 1981 and state law to proceed.  (Docs. 18, 19).  Plaintiff's remaining claims contest her alleged termination by Defendant on February 4, 2018.  This matter is now before the Court on Defendant's motion for summary judgment. (Doc. 29). For the following reasons, the undersigned recommends that Defendant's motion be granted.

**I.    Standard of Review**

The standard of review on summary judgment differs significantly from the standard of review that this Court previously applied under Rule 12.  Plaintiff may no longer rest on the allegations of her complaint.  Instead, the Court looks to the evidence submitted by the parties to determine if any triable issue remains.  Summary judgment is

1

appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

It is true that in applying this standard, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). And Defendant, as the moving party, has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). However, once the moving party has met its burden of production, the nonmoving party cannot rest on her pleadings, but must present significant probative evidence to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

In the case presented, Defendant has met its initial burden by including with its motion a "Statement of Undisputed Facts," supported by appropriate citations to the record. (Doc. 29 at 3-8). After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson*, 477 U.S. at 249-50. The court then determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of

law because the issue is so one-sided. *Id.* at 251-52. To demonstrate a genuine issue of fact, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

Plaintiff does not challenge the vast majority of the proposed facts listed in Defendant's Statement of Facts. Therefore, the undersigned has primarily determined the facts from the Defendant's citations. In limited instances where Plaintiff has challenged a proposed finding, the undersigned has construed the facts and any reasonable inferences "in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted). The requirement that facts be construed in the light most favorable to the Plaintiff, however, does not mean that the court must find a factual dispute where record evidence contradicts Plaintiff's unsupported or conclusory assertions.

## II. Undisputed Findings of Fact

Defendant DaVita Incorporated ("DaVita") provides kidney dialysis and related medical services for patients suffering from chronic kidney failure or end stage renal disease. It operates kidney dialysis centers and also provides acute care for hospitalized patients. (Doc. 29-1. Williams Decl. at ¶ 3).

Plaintiff, who is Black, is from Indianapolis, Indiana. DaVita hired Plaintiff as a full-time Acute Registered Nurse in April 2017. Plaintiff's employment was at-will. (Doc. 28-1 at 9-10, PageID 445-446). In her role as an Acute Registered Nurse, Plaintiff was responsible for providing dialysis treatment to the patients at various hospitals. Plaintiff

was originally assigned to work at Christ Hospital, but later volunteered to assist at Good Samaritan, Bethesda North, and other hospitals.

At the start of her employment, Plaintiff reported to Linda Pleiman. After Pleiman stepped down from the supervisory position, Plaintiff reported to Debra Blimline. Approximately a week before the incident that gave rise to this lawsuit, on or about January 28, 2018, Plaintiff began reporting to Stephanie Cline.[1] (Doc. 28 at 82-86, PageID 182-186).

On February 2, 2018, Plaintiff informed Cline via text message that she had applied online for a position at DaVita's clinic in Silverton, Ohio. Plaintiff sought a transfer to a clinic role because it would allow her to have set hours, unlike her acute care role. In an exchange of text messages, Cline asked Plaintiff about her anticipated time frame for the transfer, and explained that the manager of the Silverton clinic would need to contact her so that they could work through the required process for Plaintiff's request for transfer. (Doc. 28-1 at 21-22, PageID 457-458).

The day after notifying Cline of her desire to transfer, on February 3, Plaintiff was assigned to work at Bethesda North Hospital. Her shift began early on February 3, but she was scheduled to continue to take call until 5 a.m. the following day, meaning that she would receive a call if any additional patients at nearby hospitals needed dialysis. (Doc. 28 at 140-142, PageID 240-242; *see also* Doc. 29-1 at 12, PageID 547, "Acute shift was 5 am on 2/3 – 5 am 2/4"). Between 7:30 and 8:00 a.m. on February 3, Plaintiff received a call that a new patient had been added to that day's schedule at Bethesda Butler Hospital ("Butler"), a nearby facility. Plaintiff testified that, in a subsequent

---

[1] Plaintiff misspells her former supervisor's surname as "Kline."

4

telephone call around 10 a.m., a Caucasian coworker named Lisa Johnson told Plaintiff that Johnson would provide services to the Butler patient. (Doc. 28 at 143, PageID 243). However, Plaintiff admitted in her deposition testimony that at 11:11 a.m. the same day, she asked Johnson if another nurse identified as "Della" would want the add on patient at Butler, to which Johnson responded negatively. (*Id*. at 156-157, PageID 256-278).

In any event, by around 4:30 p.m., Plaintiff realized that Johnson had not shown up at Butler, and that Johnson was not responding to text messages. (Doc. 28 at 148-149, 159, PageID 248-249, 259). Plaintiff later received another follow up call inquiring when a nurse would arrive at Butler.[2] Plaintiff testified that she attempted to contact Johnson before deciding to drive to Bethesda Butler herself. En route, Plaintiff began feeling dizzy and experiencing leg cramps. She pulled over and called her daughter to pick her up. (Doc. 150 at 336-337, PageID 250-251)

After she returned home, at 7:36 p.m., Plaintiff texted Cline: "I just tried to call you I'm not feeling well I'm light headed and dizzy *still have patient at Butler*." (Doc. 28 at Ex. 7 at p. 4; Doc. 28 at PageID 458) (emphasis added). Twenty minutes later, Plaintiff texted Cline again, stating: "I don't feel safe enough to drive/ run patient." (*Id*.) Shortly thereafter, Cline responded: "Sorry on another call. Please reach out to other nurses to get coverage for the night." (*Id*.) Plaintiff did not reach out to anyone else to get coverage, nor did she inform Cline of her belief that Johnson had earlier agreed to provide coverage. Instead, Plaintiff went to sleep. (*Id*. at 153, PageID 253). She did not provide treatment

---

[2]In opposition to summary judgment, Plaintiff has filed an affidavit that states that she received a telephonic inquiry "at approximately 7:00 P.M….as to when a nurse would be at Bethesda Butler Hospital to assist." (Doc. 35-2 at ¶7). However, the affidavit does not deny earlier knowledge, and Plaintiff's text messages and deposition testimony confirm inquiry from Butler and Plaintiff's inability to reach Johnson around 4:30 p.m.

5

to the Butler patient and does not know who did. (Doc. 28 at 160-161; Doc. 28 at PageID 260-261). Plaintiff testified that she assumed Cline would try to get coverage for the Butler patient because securing coverage was Cline's job and "not my job to staff the place or find coverage." (*Id*. at 154, PageID 254)

The next day, on February 4, 2018, Cline texted Plaintiff: "I need for you to give me a call this afternoon to let me know what happened yesterday. This is not good and you will be written up for abandoning a patient." (*Id.* at 163; PageID 263). Plaintiff called Cline that afternoon. During a short but contentious telephone conversation, Cline accused Plaintiff of abandoning the Butler patient and asked Plaintiff to explain what happened. Plaintiff recounted her physical symptoms and stated that she was trying to get an appointment with her physician the following week, despite being on the schedule to work. Plaintiff testified that Cline responded by stating that Plaintiff didn't need to worry about that because Cline was "terminating your [Plaintiff's] position." (*Id.* at 169, PageID 269). Although Cline later denied making the statement to DaVita's human relations department, the undersigned concludes that a reasonable jury could easily find for Plaintiff on this factual issue. In addition to Cline's alleged direct statement to Plaintiff during the phone call, Plaintiff testified that she learned from a former co-worker that Cline stated that Plaintiff had been terminated. Plaintiff has submitted the affidavit of a former coworker to that effect. (*See, e.g.*, Doc. 35-1 at ¶2, Affidavit of Karen Judd, testifying to "personal knowledge" that Plaintiff's "termination was communicated to her fellow employees by Stephanie Cline.").[3]

---

[3] The remainder of Judd's affidavit consists of conclusory statements that Plaintiff was terminated and "treated differently" because of her race, which statements are unsupported either by personal knowledge or any specific facts. Unsupported statements are to be disregarded as insufficient to defeat summary judgment. *See Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) ("Conclusory statements

6

On February 5, Plaintiff contacted Defendant's human relations department, known as Teammate Relations ("TM Relations"), seeking to contest her "termination." (Doc. 29-1 at 5, PageID 540). TM Relations responded by writing up notes on the initial encounter and emailing Plaintiff a "Disciplinary Action Appeal Form" to complete and return. (*Id*.; *see also* Doc. 28-1 at 34, PageID 470). Cline separately reached out to TM Relations on February 5 to seek guidance on disciplining Plaintiff. (Doc. 29-1 at 9, PageID 544). After TM Relations became involved, the verbal termination by Cline on February 4 was quickly rescinded.

The rescission of Cline's February 4 verbal "termination" was conveyed to Plaintiff by three individuals, including Cline herself, on multiple occasions. First, on February 7, 2018, Cline called Plaintiff and left the following voicemail:

> Hi, Lisa. This is Stephanie. I was wanting to see if you had time to give me a call. It's in regard to the corrective action. I noticed that you had put in a request for PTO and the reason you put was wrongful termination, so I wanted to just speak with you in regards to that, so we can clear things up. <u>It is not the position of DaVita or myself that you will be terminated</u>, but just wanted to speak with you. So if you would please give me a call…

(Doc. 28 at 188-189, PageID 288-289) (emphasis added).

Cline and Plaintiff also exchanged the following text messages on February 7, 2018:

> Cline: "Trying to reach you regarding corrective action. Please give me a call."
>
> Brady: "Good afternoon. I'm at a follow up md appointment. From conversation on Sunday you had stated you terminated my position not sure what's left to discuss?"

---

unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment."); *accord*, *Hunter v. Trussel*, 2006 WL 1209374 at *2 (S.D. Ohio May 2, 2006).

7

>Cline: "I spoke with TM Relations as to corrective action *and was advised to administer a verbal warning as opposed to termination* and I just wanted to discuss this with you."

Doc. 28-1 at 22, PageID 458 (emphasis added)). Plaintiff did not respond to the text message that she would be given only a "verbal warning as opposed to termination."

Cline tried again with a text on February 8: "I wanted to reach out to discuss your position. Would you have time to discuss tomorrow?" Plaintiff texted back the same day: "I'm waiting on call from my attorney. I'll get back with you." (*Id*.) On February 9, 2018, Cline texted yet again: "Lisa I am reaching out to you regarding your intentions. While things were said on Sunday, there has been nothing done formally in the direction of termination. You were scheduled for today and are on the schedule for tomorrow. I need for you to contact me as soon as possible." (*Id*. (emphasis added)). Plaintiff texted back on February 9 with a request that Cline stop texting her and that any issues be resolved through TM Relations. Cline agreed to work through TM Relations and complied with Plaintiff's request to stop texting.

On February 12 or 13, TM Relations Advisor Lorraine Mercurio, who had been assigned to investigate the issue, interviewed Plaintiff by telephone. (Doc. 28 at 193-194, PageID 293-294; Doc. 29-1 at 10-11, PageID 545-546). During their conversation, Mercurio informed Plaintiff that her employment with Defendant had not been terminated and stated that she had been scheduled to work several days that week. (Doc. 29-1 at 11-13, *accord* Complaint, Doc. 1 at 4, PageID 4, acknowledging February 12 phone call advising Plaintiff that she was scheduled to work because she was not terminated). Despite Defendant's repeated assurances that she had not been terminated, Plaintiff insisted she had been terminated by Cline and did not return to work.

8

A third DaVita official, Senior TM Relations Manager Cindy Mallen, sent a final follow-up letter on February 23, 2018 by both email and certified mail to Plaintiff's home address.  That letter repeatedly states that Plaintiff has not been terminated and asks Plaintiff to promptly contact either Mallen or Cline:

> No termination has been processed in Workday and as of today you remain an active teammate.  You have also missed several subsequent shifts since February 5.  We are asking that you communicate to Stephanie [Cline] as to what your intentions are as it relates to returning to work.
>
> Again, this letter is to make you aware that you are an active teammate with DaVita.  Please contact Stephanie at xxx-xxx-xxxx, upon receipt of this letter.  You may also contact me via email at cindy.mallen@davita.com if you have further questions.

(Doc. 29-1 at 14, PageID 549).  The letter concludes by asking Plaintiff to contact DaVita no later than February 28, and cautions her that if she fails to do so, Defendant will assume that Plaintiff has voluntarily ended her employment.  Plaintiff did not contact Cline, Mallen or anyone else at DaVita by the stated deadline.  Therefore, DaVita processed Plaintiff's voluntary separation on March 7, 2018.

Plaintiff initiated this lawsuit on November 11, 2020, alleging unlawful termination on February 4, 2018.  Specifically, Plaintiff claims that: (1) Defendant discriminated against her based upon her race, in violation of 42 U.S.C. § 1981 and Ohio law; (2) Defendant discriminated against her based upon her national origin in violation of Ohio law; and (3) Defendant retaliated against her in violation of Ohio law.

### III. Analysis

After her Title VII claims were dismissed, Plaintiff was permitted to pursue her claim of race discrimination under 42 U.S.C. § 1981 and additional claims that Defendant engaged in unlawful employment practices under state law.  (*See* Complaint at ¶¶20-26).

Relevant to employment, 42 U.S.C. § 1981 states in part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts…." In *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006), the Sixth Circuit explained that § 1981 "prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors." *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006).

To prevail on a claim under § 1981, a plaintiff must plead and prove that "(1) he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against him on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in section 1981(a)." *Id.*, 440 F.3d at 358. More recently, in *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009 (2020), the Supreme Court clarified that a plaintiff who proceeds under § 1981 "must initially plead and ultimately prove that, <u>but for</u> race, it would not have suffered the loss of a legally protected right." *Id.*, 140 S.Ct. at 1019 (emphasis added).

### A. A Failure to Prove a Prima Facie Case of Discrimination Under § 1981

In evaluating whether Plaintiff has met her burden of proof, the undersigned first notes that Plaintiff points to no direct evidence of race discrimination. Thus, the familiar *McDonnell Douglas* burden-shifting framework is presumed to apply to Plaintiff's claims.[4] See *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817 (1973).

> Under this framework, the plaintiff bears the initial "not onerous" burden of establishing a *prima facie* case of discrimination by a preponderance of the

---

[4]*Comcast* expressed some ambivalence about "[w]hether or not *McDonnell Douglas* has some useful role to play in § 1981 cases…" *Id.* at 1019. Absent contrary authority, however, *McDonnell Douglas* continues to be applied in the Sixth Circuit.

10

>   evidence. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. To establish a *prima facie* case of employment discrimination, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees.

*White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citing *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008); *accord Clay v. United Parcel Serv.*, Inc., 501 F.3d 695, 703 (6th Cir. 2007); *see also, Burnett v. Carington Health Systems*, U.S. Dist. No. 1:11–cv–324, 2012 WL 6001034 (S.D. Ohio, Nov. 30, 2012). If a plaintiff establishes her *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision. If the defendant makes the appropriate showing, then the burden shifts once more back to the plaintiff to demonstrate that the defendant's proffered reason was a pretext for discrimination. *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-55. (1981).

On the record presented, Defendant argues persuasively that Plaintiff has failed to establish the third and fourth elements of her *prima facie* case. The third element requires proof of an adverse employment action. Plaintiff maintains that the adverse action was her termination by Supervisor Cline during their February 4, 2018 telephone conversation. And the record undoubtedly would allow a jury to conclude that Cline told Plaintiff during that short and heated conversation that she intended to terminate Plaintiff's employment based upon Plaintiff's alleged failure to report for duty the prior evening. However, it is also undisputed that Cline's initial decision was rescinded after both Plaintiff and Cline independently contacted Defendant's human relations department the very next day, February 5, 2018.

In response to Plaintiff's initial contact, TM Relations advised Plaintiff that it would investigate the contested disciplinary termination, notated the call, and emailed Plaintiff a form to complete in order to provide a statement of what transpired. Plaintiff chose not to complete the paperwork or to follow up with TM Relations. Nevertheless, Cline's impromptu verbal attempt to terminate Plaintiff on February 4 was still rescinded. On February 7, Cline clearly communicated to Plaintiff that she had been advised by TM Relations that she should not terminate Plaintiff and instead should give her only a verbal warning. In addition to Cline's multiple attempts to contact Plaintiff to communicate the change in corrective action, two TM Relations personnel related the same message, informing Plaintiff that her employment had <u>not</u> been terminated and that she should return to work as scheduled.[5] Nearly a month after the February 4 telephone call with Cline - and only after Plaintiff steadfastly refused to respond to Defendant's multiple statements that she had not been terminated and continued to refuse to return to work - Defendant concluded that Plaintiff had voluntarily resigned. (*See* Doc. 29-1 at 14, PageID 549).

At times, an employer may reverse or rescind an employment decision that otherwise would constitute an adverse action. This may occur, for instance, when a company overrules a rash decision by a supervisor that does not comply with company policy, or when an employer discovers additional facts after investigation that support reversal of a preliminary decision. Regardless of the reasons, the Sixth Circuit has held

---

[5]Plaintiff recalled receipt of messages from both Cline and from at least one TM Relations employee concerning the change in the proposed corrective action from termination to a verbal warning. (*See* Doc. 28 at 188-189, PageID 288-289; *see also id*. at 199-202, PageID 299-302). Without denying actual receipt of the final letter transmitted from Senior TM Relations Manager Cindy Callen by both email and certified mail to her home address, Plaintiff testified she did not *remember* receiving that final letter. (Doc. 28 at 206, PageID 306).

12

that an employer is sometimes permitted to rescind an initial decision without running afoul of federal law; in essence, a "do-over." This pragmatic approach forecloses federal liability in some instances for rash-but-hollow words, while maintaining federal protections for any employee who suffers real or lasting adverse consequences. Thus, "when an employer imposes an employment action that would be an adverse employment action but then quickly reverses the action, the employee has not suffered an adverse employment action." *Keeton v. Flying J, Inc.*, 429 F.3d 259, 263 (6th Cir. 2005) (citing *Birch v. Cuyahoga Cnty. Probate Ct.*, 392 F.3d 151 (6th Cir. 2004) and *Bowman v. Shawnee State Univ.*, 220 F.3d 456 (6th Cir. 2000)); *see also Parker v. Metropolitan Government of Nashville*, 2016 WL 205380, at *3 (M.D.Tenn. Jan. 15, 2016).

On the record presented here, Cline's verbal attempt to terminate Plaintiff in the heat of the February 4 call was quickly reversed and rescinded – a fact communicated to Plaintiff multiple times by three different individuals including Cline herself. The rescission of Cline's initial verbal decision was first communicated to Plaintiff on February 7 – 3 days after her conversation with Cline and a mere 2 days after Plaintiff contacted TM Relations.[6] Because Cline's initial "termination" never took effect, and because the reversal of Cline's termination decision was clearly communicated to Plaintiff, Cline's February 4 statement was akin to an "empty threat" that was never carried out. *See Smith v. Chicago Transit Auth.*, 2014 WL 3892233 at *7 (N.D. Ill. Aug. 5, 2014); *Beard v. Don McCue Chevrolet, Inc.*, 2012 WL (N.D. Ill July 18, 2012) (plaintiff did not suffer adverse action where supervisor called to tell hm he was terminated for leaving early, but told him the next day that he was not terminated and could continue working there if he wanted).

---

[6] Defendant reversed Cline's verbal termination based upon its initial investigation, without waiting for Plaintiff to complete paperwork as part of the investigatory process.

Cline herself repeatedly told Plaintiff that she would be issuing only a verbal warning.[7] In short, the undisputed record shows that Cline's reactive threat to terminate Plaintiff's position on February 4, 2018 never amounted to any actual change in Plaintiff's employment status.

Plaintiff also cannot establish the fourth element of her prima facie case – either that she was replaced by a person not in her protected class or that similarly situated non-protected employees were treated more favorably. Plaintiff has presented no evidence at all that she was replaced by a Caucasian nurse. And, while Plaintiff states her general *belief* that Caucasian nurses were treated more favorably, she has provided no *evidence* that would substantiate that otherwise wholly subjective and conclusory belief. In *Mitchell v. Toledo Hosp.*, 964 F.2d at 584-85, the Sixth Circuit affirmed the trial court's grant of summary judgment despite the plaintiff's submission of a similar affidavit based almost entirely on hearsay and conclusory allegations:

> [T]he Affidavit was not a proper Rule 56(e) affidavit because it was not made on personal knowledge and did not set forth "facts" that would be admissible into evidence. Even if the Court were to consider the Affidavit, the statements contained therein are nothing more than rumors, conclusory allegations and subjective beliefs which are wholly insufficient evidence to establish a claim of discrimination as a matter of law.

*Id.*; *see also Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 268 (6th Cir. 1986) ("mere personal belief, conjecture and speculation are insufficient to support an inference of …discrimination."). As in Mitchell, Plaintiff's subjective belief that Defendant has a "known" practice of racial discrimination is insufficient to establish the fourth element of her prima facie case.

---

[7] In this lawsuit, Plaintiff contests only the (rescinded) verbal termination, not the proposed verbal warning. *But see generally*, *Rush v. E.I. DuPont DeNemours and Co.,* 911 F.Supp.2d 545, 570 (S.D. Ohio 2012) (warning that was not accompanied by any change in pay or conditions was not adverse).

In a final attempt to establish that a Caucasian coworker was treated more favorably, Plaintiff argues that Lisa Johnson was similarly situated and was not disciplined despite "stat[ing] to Stephanie Kline [sic] that she would provide service to the patient [at Butler], but… not show[ing] up at all." (Doc. 35 at 3). In support of her assertion that Johnson committed the same offense, Plaintiff has filed an affidavit wherein she states (for the first time) that Johnson directly informed both Plaintiff *and Cline* that Johnson would provide services to the Bethesda Butler patient. (Doc. 35-2 at ¶ 6, PageID 619). But Plaintiff cites to no specific facts to support the new hearsay statement that Johnson informed her supervisor that she would care for the Butler patient. Plaintiff testified that she had no personal knowledge of Johnson and Cline's communications, and her affidavit is undermined by other evidence of record including Plaintiff's prior testimony.[8] An affidavit must "be made on personal knowledge, set out as facts that would be admissible in evidence." Rule 56(c)(4); *see also Marbury v. Abraham*, 2009 WL 4730603 (S.D. Ohio Dec. 8, 2009) ("[C]onclusory assertions, unsupported by *specific facts* made in affidavits opposing a motion for summary judgment, are not sufficient to defeat a motion for summary judgment.") (emphasis original, quotation omitted); *L.F.P.IP. LLC v. Hustler Cincinnati, Inc.*, 533 Fed. Appx. 615, 621 (6th Cir. 2013) (quoting Rule 56 and holding

---

[8]Plaintiff's affidavit does not suggest any personal knowledge of communication between Johnson and Cline, and Plaintiff testified that she and Johnson were assigned to work at different hospitals. (Doc. 28 at 139, PageID 239). Plaintiff further testified that she was not privy to Cline's communications with other nursing staff. (*Id.* at 154-155, PageID 254-55). Plaintiff testified to her belief that because Cline, Johnson and Plaintiff were all working on February 3, all three "*should* have been aware, as far as what was going on and who was covering what." (*Id.* at 161, PageID 261 (emphasis added)). However, Plaintiff herself never told Cline that Johnson had agreed to cover the Butler patient. (*Id.*; see also id. at 153, PageID 253). In addition to deposition testimony that undermines the new assertion are a series of text messages. For example, Plaintiff's February 3 texts with Johnson contain a brief exchange about the Butler patient, but no texts suggest that Johnson was planning to care for that patient. (*See* Doc. 28-1 at 33, PageID 469). Likewise, texts from Plaintiff to Cline state only that Plaintiff had been en route to cover the Butler patient but did not complete the assignment due to illness. (Doc. 28-1 at 22, PageID 458).

that self-serving testimony was insufficient to defeat summary judgment whether statements were not supported by citations to the record.).

In addition to the lack of evidence that Cline had any knowledge of Johnson's alleged intention to provide care for the Butler patient,[9] Plaintiff points to no evidence that Johnson received less discipline. Plaintiff specifically testified that she had no access to other employees' personnel files and was unaware if any disciplinary actions were taken against them. (Doc. 28 at 273, PageID 373). Plaintiff cannot prove her prima facie case and defeat summary judgment with the wholly unsupported assertions contained in her affidavit.

### B. A Failure to Prove Pretext

Even if a reviewing court were to determine that Plaintiff could prove her prima facie case, the Defendant would still be entitled to summary judgment because Plaintiff cannot overcome Cline's legitimate and non-discriminatory reason for the alleged verbal termination on February 4. It is undisputed: (1) that Plaintiff was assigned to take call on February 3 and received notice of the add-on Butler patient that morning; (2) that Plaintiff's scheduled shift did not end until February 4 at 5:00 a.m.; (3) that Plaintiff was aware by late afternoon or early evening on February 3 that Johnson was not covering Butler and that Plaintiff would need to take care of the Butler patient; (4) that Plaintiff texted Cline at 7:36 pm that she had planned to take care of the Butler patient but had gone home sick; (5) that Cline asked Plaintiff to find substitute coverage; (6) that Plaintiff did not respond to Cline's request that she find substitute coverage; (7) that Plaintiff went to sleep without

---

[9]During her deposition, Plaintiff stated only that Johnson told *Plaintiff* in a telephone conversation on the morning of February 3 that she would cover the Butler patient. No other evidence in the record indicates that Johnson communicated that intention to anyone.

notifying Cline that she was taking no further action because she believed it was Cline's job to secure overage; (8) that Plaintiff never conveyed to Cline that Johnson would cover. Based upon these undisputed facts, the stated basis for Cline's disciplinary action on February 4, 2018 (Plaintiff's alleged abandonment of her duties to the Butler patient) appears to have been legitimate and non-discriminatory. Plaintiff points to no evidence that would support a conclusion that Cline's proffered reason for the verbal termination was pretextual.[10]

For the same reasons that her unsupported statements are insufficient to establish her prima facie case, Plaintiff's conclusory statement that "it was known that DaVita did not support transfers or promotions requested by Black employees", (Doc. 35-2 at ¶3; *see also* Doc. 1 at 2, PageID 2), is insufficient to show pretext by the alleged decisionmaker, Cline. Additionally, Plaintiff testified in her deposition that Cline terminated her not based upon racial animus, but instead because "she was upset about me wanting to transfer – I mean, but that's my opinion because I didn't have any reason for her to terminate me." (Doc. 28 at 257, PageID 357; *accord* Doc. 1 at 2, "It was apparent that [Cline] did not want the Plaintiff to transfer *because of the Plaintiff's excellent working habits and skills*.") (emphasis added).

### C. Abandoned National Origin and Retaliation Claims

Because Plaintiff has failed to respond to any of Defendant's arguments concerning her national origin and retaliation claims on summary judgment, she has abandoned those claims. *See Brown v. VHS of Michigan, Inc.*, 545 Fed. Appx. 368, 372

---

[10]Plaintiff's claim rests on her insistence that Cline's subsequent rescission of her verbal termination on February 4 was ineffective. Notably, she does not challenge Defendant's ultimate decision to separate Plaintiff from employment after Plaintiff refused to respond to Defendant's repeated entreaties for Plaintiff to communicate her intentions or return to work.

17

(6th Cir. 2013). In the alternative, however, the undersigned finds Defendant's unopposed arguments to be persuasive.

Plaintiff's "national origin" discrimination claim is entirely duplicative of her race discrimination claim, insofar as it is based upon Plaintiff's national origin as "African-American." (Doc. 28 at 288, PageID 388). Plaintiff's retaliation claim also fails as a matter of law. Plaintiff has failed to offer any evidence that she engaged in protected activity prior to February 4; in fact, she testified that she did not. (Doc. 28 at 209, PageID 309). In addition, Plaintiff testified that she believed that Cline fired her in retaliation for her request to transfer to the Silverton Clinic as opposed to firing her for some protected activity. (*Id*. at 295; PageID 395). And again, even if she could prove a prima facie case of retaliation, Defendant has offered legitimate non-retaliatory reasons for Plaintiff's separation from employment: (1) Cline's reasonable belief that she had neglected her duties on February 3; and (2) Plaintiff's refusal to return to work as scheduled after being informed (repeatedly) that Cline's initial statement to terminate her on February 4 had been reduced to a verbal warning.

### IV. Conclusion and Recommendation

For the reasons stated, **IT IS RECOMMENDED THAT** Defendant DaVita's motion for summary judgment (Doc. 29) be **GRANTED**, and that Plaintiff's remaining claims be dismissed with judgment to be entered in Defendant's favor.

                                                                                                  *s/Stephanie K. Bowman*
                                                                                                  Stephanie K. Bowman
                                                                                                  United States Magistrate Judge

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

LISA M. BRADY,                                                            Case No. 1:20-cv-910

       Plaintiff                                                          Barrett, J.
                                                                             Bowman, M.J.

            v.

DAVITA, INCORPORATED,

       Defendant

**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).